JACKSON B. BRAGG AND SUSANNE BRAGG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOHN E. KAYE AND CAROLINE KAYE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bragg v. Commissioner
Docket Nos. 19598-84, 30213-84.
United States Tax Court
T.C. Memo 1986-562; 1986 Tax Ct. Memo LEXIS 45; 52 T.C.M. (CCH) 1071; T.C.M. (RIA) 86562; November 24, 1986. J. Doyle Tumbleson, for the petitioners. Charlotte D. Sennot, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax in the consolidated cases of Jackson B. and Susanne Bragg (docket No. 19598-84) and John E. and Caroline Kaye (docket No. 30213-84) for 1980 and 1981: Addition
Sec. 6653(b),
Docket No.
Year
Deficiency
I.R.C. 1954
19598-84
1980
$14,508
$ 7,254
19598-84
1981
$25,151
$12,576
30213-84
1980
$20,817
$10,409
30213-84
1981
$39,118
$19,559
In addition, respondent determined, alternatively, that petitioners Jackson B. and Susanne Bragg are liable for additions to tax *46 under section 6653(a) [1] for 1980 and section 6653(a)(1) and (2) for 1981. The issues for decision are as follows: 1. Whether petitioners in both cases had unreported income from taxable kickbacks for 1980 and 1981. 2. Whether any part of the underpayment of both petitioners Jackson B. and Susanne Bragg, in docket No. 19598-84 and petitioner John E. Kaye in docket No. 30213-84 was due to fraud within the meaning of section 6653(b). 3. Alternatively, whether petitioners Jackson B. and Susanne Bragg are liable for additions to tax for 1980 under section 6653(a) and for 1981 under section 6653(a)(1) and (2). A number of other issues raised by the pleadings have been settled by the parties. FINDINGS OF FACT All four petitioners Jackson B. and Susanne Bragg, husband and wife, and John E. and Caroline Kaye, husband and wife, were legal residents of Florida when the petitions were filed. Each couple, respectively, filed joint Federal income tax returns for 1980 and 1981 with the Office of the Internal Revenue Service, Atlanta, Georgia. Petitioners Jackson B. Bragg *47 (Dr. Bragg) and John E. Kaye (Dr. Kaye) are osteopathic physicians and have practiced their professions for a number of years in the Daytona Beach area of Florida. During 1980 and 1981, they were each one-third shareholders in Daytona Beach General Hospital, Inc. (the hospital); the other one-third of the shares was publicly owned by about 350 shareholders. Dr. Bragg was president and director and Dr. Kaye was secretary, treasurer, and director of the hospital. Francis Monaco (Monaco) started working at the hospital as director of the clinical laboratory pursuant to a written contract dated September 18, 1978. Dr. Bragg and Dr. Kaye personally negotiated the contract with Monaco for his services. Monaco at first was to receive 35 percent of the gross monthly proceeds derived from the operation of the clinical laboratory facilities at the hospital. The direct cost of supplies, salaries, payroll taxes, group insurance, repairs, equipment leasing, and blood was to be deducted from his 35 percent of the proceeds. His percentage was later raised to 40 percent and then to 42 percent. During 1980 and 1981, Monaco's fee was 42 percent. Under the terms of the contract, the hospital *48 agreed that it would do "all billing and accounting and that the charges shall be made daily and delivered to the accounting department and payment shall be to Monaco on a monthly statement payable 10 days from the rendering of each monthly statement." When Monaco started working at the hospital, it had an inventory of supplies which was turned over to him. To compensate the hospital for those supplies, deductions were made each month from the fees to which he was otherwise entitled until the hospital was paid. In addition to the written contract, Dr. Bragg and Dr. Kaye (sometimes hereinafter referred to collectively as the doctors) had an oral agreement with Monaco whereby Monaco was to pay them personally each month the greater of $1,000 or 10 percent of his gross laboratory fees. Monaco was required to make these payments in order to obtain the contract to run the laboratory. Dr. Bragg and Dr. Kaye insisted that the 10 percent be paid to them in cash. The cash was divided equally, placed in two envelopes, and delivered to the doctors by one of the laboratory employees.The doctors did not give Monaco a receipt for the money. Monaco made his last payment to the doctors in *49 October 1981 when the hospital was leased to Bernie Bachs (Bachs). The following table summarizes for 1980 and 1981 the amount of Monaco's gross laboratory fees, the amounts of the checks issued to him (his percentage less deducted expenses), the amount deposited each month to his bank account, and the difference between the amounts of his checks and the amounts deposited: 1980
Gross Fees
Net Check
Deposited
Difference
Jan.
$29,422.57
$22,579.34
$19,637.34
$ 2,942.00
Feb.
37,114.45
29,974.57
26,977.57
2,997.00
Mar.
33,259.70
26,410.07
23,085.07
3,325.00
Apr.
38,511.31
30,374.67
26,524.67
3,850.00
May
38,621.14
31,582.78
27,720.78
3,862.00
June
30,677.43
22,861.21
19,807.21
3,054.00
July
32,653.53
25,484.15
22,219.15
3,265.00
Aug.
31,874.85
24,824.24
21,637.24
3,187.00
Sept.
30,148.86
23,112.43
20,098.43
3,014.00
Oct.
26,946.36
19,859.59
17,165.59
2,694.00
Nov.
28,720.02
21,775.99
18,883.99
2,872.00
Dec.
24,191.62
21,772.62
2,419.00
Total
$37,481.00
1981
Gross Fees
Net Check
Deposited
Difference
Jan.
$26,927.67
$20,829.91
$18,182.91
$ 2,647.00
Feb.
43,355.55
37,535.90
33,200.90
4,335.00
Mar.
35,134.52
29,314.13
25,801.13
3,513.00
Apr.
36,300.18
29,103.88
25,555.88
3,548.00
May
41,026.49
38,029.95
33,927.95
4,102.00
June
32,606.07
26,296.82
23,036.82
3,260.00
July
27,587.70
21,693.91
18,935.91
2,758.00
Aug.
14,804.77
11,976.77
2,828.00
Sept.
13,698.81
10,829.81
2,869.00
Oct.
28,792.39
28,792.39
25,913.39
2,879.00
Total
$32,739.00
*50 Monaco paid Dr. Bragg and Dr. Kaye the amounts of the "Difference" shown in the foregoing table, $37,481 for 1980 and $32,739 for 1981. [2] Neither Dr. Bragg nor Dr. Kaye reported these payments as income. After Bachs leased the hospital, Monaco continued to operate the chemical laboratory on the same terms as he had when Dr. Bragg and Dr. Kaye ran the hospital except that he no longer made the monthly cash payments to them. In July 1982, Dr. Bragg and Dr. Kaye had to take the hospital back from Bachs because he was unable to make the lease payments. Dr. Bragg and Dr. Kaye rehired Monaco to run the laboratory. Instead of paying him 42 percent of the laboratory billings, however, they paid him 35 percent and he did not thereafter make the cash payments to the doctors. On January 7, 1983, Monaco called Dr. Bragg and informed him that Monaco's income tax returns were being audited with respect to his dealings with the hospital. *51 Dr. Bragg asked Monaco to meet with him and Dr. Kaye. Within a few days, Monaco and his accountant, James Dreggors (Dreggors), went to the hospital to see the doctors. The doctors asked Monaco first to meet with them privately without Dreggors being present, and he did so. At this private meeting, the doctors asked him to sign a $72,000 note to them. He told the doctors that he would "like to take that note" and "go over it with my CPA, and then it was pulled out of my hands." The doctors subsequently offered to raise his percentage to 60 percent if he would sign the note but he did not do so. The audit of petitioners' income tax returns for 1980 and 1981 began in July 1983. At his initial interview with the investigating agent, Dr. Bragg was asked whether anyone owed him any money and whether he had received any loan repayments and he answered "no" to both questions. At Dr. Kaye's interview a few days later, the revenue agent asked him whether he had received any loan repayments, and he stated that both he and Dr. Bragg received loan repayments from Monaco. He stated that there was no written evidence of a loan to Monaco and that it was a gentlemen's agreement. In response *52 to respondent's request for the production of documents, Dr. Bragg produced his desk top calendar for the period October 9, 1981 through December 31, 1982, with some missing pages. The calendar contains 14 pages with the notation "Monaco owes B and K $13,000." At the trial, respondent called an expert examiner of questioned documents to testify as to the dates on which the 14 entries were made. The parties stipulated that nine of them were not made concurrently with the dates set forth on the calendar but were instead made 2 years later. It could not be established when the remaining five entries were made. Approximately 2 weeks before trial Dr. Kaye telephoned Mrs. Monaco wanting to know if Monaco had been served a subpoena to testify and suggested to her that it would be better if Monaco refused to testify or was unavailable to testify at petitioners' trial. Dr. Kaye also asked her if Monaco could go to Mexico with Dr. Bragg to avoid subpoena service. In 1980 and 1981, Mrs. Bragg created categories on a check register for items including convention expenses, entertainment expenses, dues, business car, business telephone, interest, professional fees, medical, taxes, and personal. *53 The check registers were given to the accountant for use in the preparation of their returns. As a result of Mrs. Bragg's check register classifications, deductions were taken for the entire home telephone expense as "business phone" expense, the family's entire automobile expense as "business car" expense, Mrs. Bragg's airfare to and meals at medical conventions as "convention expenses," and personal expenses for flood elevation of their residence and personal legal expenses as "professional fees." Dr. and Mrs. Kaye claimed deductions for the following personal expenses: automobile expenses, wages paid to their maid, their entire telephone and utility expense, and an oriental rug. In their check register, they characterized their home telephone expenses as "business phone," their home utilities expense as "farm electric," and their family automobile expense as "business gasoline." The oriental rug in their personal residence was described as "area rugs -- rental house." Respondent determined that petitioners received additional income in the form of kickbacks which was not reported on their income tax returns and that they are liable for additions to tax under section 6653(b). *54 On brief, respondent does not argue that petitioner Caroline Kaye is liable for the section 6653(b) additions to tax and in the opinion that follows we treat the fraud issue as to her as conceded by respondent. OPINION 1. Kickback Issue
We have found as a fact that Monaco made kickback payments in stated amounts to Dr. Bragg and Dr. Kaye and they did not report any of the payments as income. In making those findings, we have recognized that the issue of whether the doctors received kickbacks is one of credibility. In our judgment, the evidence would permit no other realistic finding. Monaco testified unequivocally that he agreed to, and did, make kickback payments to the doctors, and his testimony was not seriously shaken by cross-examination. He testified that he had one of the laboratory employees deliver cash to the doctors' offices in a sum equal to 10 percent of his gross laboratory fees in amounts which ranged from $2,400 to over $4,300 each month. The doctors admitted that Monaco's employees delivered cash to each of the offices but they contend that the cash represented repayments of loans they had made to Monaco. The doctors testified that they each usually *55 carried $3,000 to $4,000 in currency on their persons and that they made the loans from such funds to Monaco and others. They further testified that each of them made loans to Monaco in exactly the same amount each time and that this practice of each making loans in exactly the same amounts explains why each received equal repayments from him. We have concluded that Monaco's testimony is believable. We think it incredible that loans of such magnitude would be made repeatedly without any documentation, that the doctors would always make such personal loans in exactly the same amounts, and that they would always divide Monaco's repayments exactly equally. In making our findings, we have taken into account Dr. Bragg's initial statements to the investigating revenue agent that no one owed him any money and that he had received no loan repayments. Also, we have been influenced by the doctors' efforts, after the audit of Monaco's returns began, to get Monaco to sign a $72,000 note at a meeting where Monaco's accountant was excluded. We have given weight to Dr. Bragg's sprinkling his 1980-1981 calendar 2 years later with statements that "Monaco owes B and K $13,000" in an apparent effort *56 to provide documentary evidence of indebtedness and his failure to admit that the entries were not made on the dates indicated until after respondent had served on his counsel a questioned-documents expert report to that effect. In sum, we find that petitioners (except as otherwise stipulated) have not carried their burden of proving that respondent's determinations of deficiencies are erroneous. 2. The Fraud Issue
Section 6653(b) provides for the imposition of an addition to tax if any part of an underpayment is "due to fraud." Under this statute, fraud is established if it is shown by clear and convincing evidence that the taxpayer intended to evade taxes believed to be owing by conduct designed to conceal, mislead, or otherwise prevent the collection of such taxes. ; , affg. a Memorandum Opinion of this Court; . The burden of showing fraud by clear and convincing evidence rests with respondent. Sec. 7454. Respondent has made the requisite showing. *57 Many of the facts discussed above in connection with the deficiency issue demonstrate an effort by Dr. Bragg and Dr. Kaye to conceal income and mislead the Internal Revenue Service and thereby escape tax on their kickback income from Monaco. Although the head of the accounting department negotiated other contracts, the doctors personally negotiated the contract with Monaco. Instead of including a provision in the hospital's written contract with Monaco for them to receive a monthly sum equal to 10 percent of Monaco's monthly gross receipts they made their agreement with him orally. Rather than having Monaco's payments made to them by check, which would be a normal but easily traceable business practice, they had their kickback payments made to them in currency delivered to their respective offices. See . The doctors kept no records of their dealings with Monaco and reported none of Monaco's cash payments as income. We think it clear that their failure for 2 consecutive years to report the payments as income is strong evidence of fraud. , *58 affg. a Memorandudm Opinion of this Court. The doctors' efforts to manufacture a written record tending to show that the kickback payments were loan repayments provides further evidence of their attempts to conceal the true nature of the payments. In January 1983 after Monaco informed them that his taxes were being audited, the doctors asked Monaco to sign a $72,000 note and then grabbed it out of his hands when he suggested that his accountant look it over. In an effort to provide some current record of indebtedness, Dr. Bragg entered the notation "Monaco owes B and K $13,000" on his desk calendar on 14 different dates during the period Monaco was making payments to the doctors. Although some of the notations were made in blue ink and some in black, an expert determined, and Dr. Bragg later admitted, that he had made nine of the notations 2 years after the fact, indicating an intent to conceal or mislead. In a further attempt to support their loan repayment theory, petitioners submitted in evidence a document dated January 11, 1983, purporting to recite a $13,000 balance due on cash loans made by the doctors to Monaco. We find the document totally unreliable. First, although *59 the document purports to bear the signatures of Monaco, Dr. Bragg, and Dr. Kaye, Monaco testified that he never signed the document and saw it for the first time in connection with this case. Second, Dr. Bragg failed to positively identify Monaco's signature at trial, but testified that he knew Monaco signed a document just like it. Furthermore, Dr. Bragg testified that he did not see Monaco sign the document and did not know if he signed it, but merely assumed that he did. Moreover, while Dr. Bragg claimed that the document was prepared on January 11, 1983, and signed by himself, Dr. Kaye, and Monaco a few days later, he told the investigating agent in July 1983 that no one owed him money and that he had received no loan repayments. Dr. Kaye told the revenue agent a few days later that although he and Dr. Bragg received loan repayments from Monaco, no written evidence of such a loan existed. We think Monaco's signature on the document was forged and that the document constitutes strong evidence of petitioners' intent to conceal and mislead by disguising the kickback payments as loan payments. Petitioners' attempts to prevent Monaco from appearing at trial are further evidence *60 of their intent to evade taxes. Only days before trial, Dr. Kaye telephoned Mrs. Monaco and asked her if Monaco had received a subpoena to testify at trial. In the same conversation, Dr. Kaye suggested that Monaco go to Mexico with Dr. Bragg to avoid being served with a subpoena, stating that it would be better if Monaco refused to testify or was unavailable to testify. Petitioners argue that the evidence demonstrating that the doctors tried to mislead or conceal facts from the investigating agents is beside the point because the state of mind when the return is filed is controlling, citing . Such evidence, however, is an indication of their intent to evade taxes at the time the returns were filed. , affg. ; , affg. a Memorandum Opinion of this Court. Add the facts relating to the kickbacks to the tax misleading reporting on telephone, utility, and automobile expenses described in our findings and we think it apparent that *61 part of the underpayment of taxes by petitioners was due to fraud. Although Mrs. Bragg was not shown by the evidence to have been involved in the dealings with Monaco, she created the categories on her family's check register which classified the entire home telephone expense as "business phone" expense, the family's entire automobile expense as "business car" expense, her personal expenses at conventions as "convention expenses," and work on the family residence and personal legal expenses as "professional fees." We are convinced that she knew that the register containing its misleading labels would be used by their accountant in the preparation of their return. These facts, we are convinced, are sufficient to show that part of the underpayment of tax was due to fraud. Accordingly, respondent's deficiency determinations, except as modified by stipulation, are sustained. Petitioners Jackson B. Bragg and Susanne Bragg and petitioner John E. Kaye are liable for the resulting section 6653(b) addition to tax. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. The amounts of the payments to Dr. Bragg and Dr. Kaye for Feb. and Dec. 1980 was 10 percent of Monaco's net check for those months. Dr. Bragg called and told Monaco that he had made an error. Monaco then made additional payments for those months.↩